CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 14 2012

JULIA C. DUDLEY, CLERK
BY: /s/
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| ADRIENNE SEWELL, | ) | Civil Action No. 7:11cv00124 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| WELLS FARGO BANK, N.A. and | ) | |
| WELLS FARGO & COMPANY | ) | |
| | ) | **By: Samuel G. Wilson** |
| Defendants. | ) | **United States District Judge** |

This is an action pursuant to the court's diversity jurisdiction, 28 U.S.C. § 1332, by plaintiff Adrienne Sewell, a former Wells Fargo bank teller, against defendants Wells Fargo, N.A. and Wells Fargo & Company (collectively, "Wells Fargo") for breach of contract and defamation arising out of Wells Fargo's decision to terminate Sewell. By earlier memorandum opinion, the court found that Sewell had pled facts sufficient to survive Wells Fargo's November 22, 2011, motion to dismiss. Though Sewell was an at-will employee and her theories of liability had remained fluid,[1] the court found that the well-pleaded allegations, accepted as true and viewed in the light most favorable to Sewell, plausibly alleged (1) a breach of contract based on accrued but undelivered benefits and (2) defamation based on Wells Fargo's statements to bank customers about Sewell's termination. The matter is now before the court on the parties'

---

[1] Sewell has submitted a total of four versions of her complaint. (See Mem. Op. 1, n.1, ECF No. 32.) The court based its earlier memorandum opinion on the fourth version.
  The court notes that Sewell has filed a slew of motions in this case—sixteen in total, with six of them postdating her motion for summary judgment. Some are blemished by inaccuracies, while others inject theories not previously argued. Rather than engaging their faults point-by-point, it suffices to say that the court has closely examined each motion and, while not wishing to discourage zealous advocacy, believes counsel may have unreasonably multiplied these proceedings. See 28 U.S.C. § 1927 ("Any attorney or other person admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.").
  The court finds no merit in Sewell's outstanding motions and therefore denies them.

cross-motions for summary judgment. After months of discovery and a flurry of filings, Sewell has yet to establish a factual basis to support her claims. The court therefore finds no triable issues, grants Wells Fargo's motion for summary judgment, and denies Sewell's cross motion.

I.

Wachovia Bank hired Sewell in 2005. When Wells Fargo acquired Wachovia and its employees at the end of 2008, it implemented policies that it published partly in the Wells Fargo Team Member Handbook and the Bank's Code of Ethics and Business Conduct. Each year, Wells Fargo required its employees to review and formally acknowledge those policies and procedures. In February of 2010, Sewell did just that when she signed a "Team Member Acknowledgement" stating, "I have been provided the link to access the online Wells Fargo Team Member Handbook. I understand that the policies it contains do not constitute an express or implied contract of employment, and that my employment is at will." (Mot. Summ. J. Ex. A., 7, ECF No. 65-2.) The Team Member Handbook itself reiterated the nature of Sewell's employment:

> This handbook contains essential information about Wells Fargo Human Resources (HR) policies. . . . It is meant as an outline of policies and procedures covering Wells Fargo and its subsidiaries—it is not a contract of employee "rights[]" . . . .
>
> . . . .
>
> This handbook is not a contract of employment. Your employment with a Wells Fargo company has no specified term or length; both you and Wells Fargo have the right to terminate your employment at any time, with or without advance notice and with or without cause.
>
> This is called "employment at will." Only an officer of Wells Fargo at the level of executive vice president or higher, authorized by the senior Human Resources Manager for your business group, may alter your at-will status or enter into an agreement for employment for a specified period of time. Any modification to your at-will employment status must be confirmed in writing by an officer of

2

>Wells Fargo at the level of executive vice president or higher, authorized by the senior Human Resources Manager for your business group.

(<u>Id.</u> at 8, 14.)[2]

One of Wells Fargo's written policies instructed that an individual teller's cash-drawer total should not exceed a certain maximum amount. When a teller accumulated too much cash and needed to reduce the amount, the teller was supposed to "sell" the excess cash. The teller (called the "selling teller" or "first teller") accomplished this task by entering a cash "sale" into the bank's electronic record-keeping system and electronically directing the sale to a "buying teller" (also called the "second teller"). The first teller then physically delivered the "sold" cash to the second teller. The second teller verified the amount, recorded the cash "buy" in the bank's electronic record-keeping system, and retained the cash. The result was, or should have been, a reduction of the first teller's cash-drawer total to less than the allowed maximum—a fact reflected at the time the teller later balanced his or her cash drawer.

In February of 2010, Wells Fargo senior investigative agent Larry Williams began an investigation into a cash-drawer shortage at Sewell's branch. During the investigation, Williams learned that certain tellers were using "sham transactions" to falsely show cash-drawer totals below the allowed maximum. In these sham transactions, the first teller would enter a cash sale into the bank's electronic record-keeping system and a second teller would electronically buy the cash, but the first teller would *not physically deliver* the cash to the second teller. Then the first teller would balance his or her drawer to show an acceptable cash total and "rebuy" the undelivered cash from the second teller. Using this method, the first teller could balance his or

---

[2] Wells Fargo also published a Benefits Book, which explained the various benefits available to bank employees. Like the Team Member Handbook, the Benefits Book contained a disclaimer: "While reading this material, be aware that . . . [t]he plans are provided as a benefit to eligible team members and their eligible dependents. Participation in these plans does not constitute a guarantee or contract of employment with Wells Fargo . . . ." (Mot. Summ. J. Ex. A., 10, ECF No. 65-3.)

her cash drawer to reflect an acceptable total without removing cash from the drawer. The side-effect, of course, was that electronic bank records briefly reflected inaccurate cash-drawer totals.

After learning of the tellers' practice, Williams combed through the bank's electronic records in search of sell-balance-rebuy patterns. He found that seven tellers had engaged in the suspicious pattern and that Sewell had been involved in nine of the transactions as the so-called second teller. On March 11, 2010, Williams interviewed Sewell and two of the other suspected tellers. Though some of the transactions had innocent explanations, all three tellers admitted to engaging in the practice. Indeed, Sewell signed a document admitting her involvement:

> Q: Do you acknowledge that your participation with processing buys and sells on the system without exchanging cash to maintain cash limits for other tellers is manipulating the teller settlement and a falsification?
>
> A: I now understand that but at the time did not.
>
> [/s/ Adrienne Sewell][3]

(Mot. Summ. J. Ex. A, 88, ECF No. 65-3.) Williams eventually interviewed the other tellers (resulting in similar admissions[4]) and reported his findings to Wells Fargo's Senior Human

---

[3] On June 15, 2011, on the same day that Wells Fargo filed its motion for summary judgment, Sewell filed her own motion for summary judgment. Nearly a month later, Sewell moved to "correct the record" by offering a copy of her entire written admission—mistakenly believing that the entire document was not present in the record. (Wells Fargo in fact filed Sewell's entire statement with its June 15th motion for summary judgment.) Finally, on July 25, 2012, Sewell reversed course and moved to *exclude* her entire written admission, claiming that it was hearsay and a product of duress. The motion is a novel, belated, and vexatious effort to recast established facts and issues.

[4] The written admissions included the following: "The activity of electronically buying/selling money without the cash physically changing hands between teller[s] has been going on since I began employment. I remember myself, Adrienne [Sewell], [and three others] participating in this practice." (Mot. Summ. J. Ex. A, 85, ECF No. 65-3) (signed admission dated March 15, 2010). "I acknowledge that I misstated my balance sheet so I would be under the cash limit. This activity started 3 years ago and was taught to us by Adrienne [Sewell]. We would buy and sell money without exchanging money. All of the tellers did this same procedure." (Mot. Summ. J. Ex. A, 86, ECF No. 65-3) (signed admission dated May 12, 2010). "When I have to . . . be under the limit in order to be balanced, . . . I did sell [cash] in the system, even though the . . . money is still with me, and [Sewell would] sell it back to me in the system." (Mot. Summ. J. Ex. A, 87, ECF No. 65-3) (signed admission dated March 11, 2010). One teller, however, did not sign an admission and "began using profanity and announced that she was resigning and left the room." (Mot. Summ. J. Ex. A, 84, ECF No. 65-3.)

Resources Advisor and the District Manager. All three of them agreed that Wells Fargo should terminate the involved employees. On March 15, 2010, Wells Fargo notified Sewell in writing that it had terminated her, effective immediately, and that she was "not eligible for rehire." (Mot. Summ. J. Ex. A, 1, ECF No. 65-2.)

Sewell then filed this lawsuit. After multiple amendments to correct deficiencies and assert other grounds for relief, Sewell eventually refined her claims to include defamation, breach of contract, and wrongful termination. In the final incarnation of her complaint asserting those grounds, Sewell claimed that Wells Fargo defamed her when bank employees discussed her termination with various people, that Wells Fargo breached a contract by terminating her for cause when there was in fact no cause for termination and therefore no basis for withholding benefits, and that Wells Fargo wrongfully terminated her in violation of Virginia's public policy. On January 27, 2012, the court entered a memorandum opinion and order dismissing Sewell's wrongful termination claim but finding that she had finally pled facts sufficient to support her contract and defamation claims. The court explained that the well-pleaded allegations, accepted as true and viewed in the light most favorable to Sewell, plausibly alleged a breach of contract based on Wells Fargo's alleged failure to provide accrued benefits. (See Mem. Op. 5, ECF No. 32.) The court further explained that Sewell had stated a plausible defamation claim based on her allegations that persons hearing Wells Fargo's statements inferred that Wells Fargo terminated Sewell for problems with money or honesty. (Id. at 12.) Once again, those two claims are before the court, now on the parties' cross-motions for summary judgment.

## II.

When evaluating Wells Fargo's earlier Rule 12(b)(6) motion to dismiss, the court liberally construed Sewell's complaint and allowed her breach of contract claim to proceed based

5

on the single theory that Sewell had accrued, but not received, benefits to which she would have been entitled had Wells Fargo not terminated her in the manner it did. Though given the benefit of the doubt and months of discovery, Sewell persists in obfuscating rather than demonstrating an actual, factual basis supporting her breach of contract claim. After having reviewed hundreds of pages of evidence and having followed myriad dead-end factual allegations, the court is yet unable to discern a factual basis for Sewell's claim and therefore grants Wells Fargo's motion for summary judgment.[5]

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). There are three elements to a breach of contract action in Virginia: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of that obligation. Filak v. George, 267 Va. 612, 614 (2004). In Virginia, employment is at will unless otherwise stated and may be terminated for any reason or for no reason at all. Lockhart v. Commonwealth Educ. Sys., 247 Va. 98, 102 (1994). But, as the Supreme Court of Virginia has noted, because "so-called 'fringe benefits' tend to better employee morale, improve performance and lessen turnover, all to the distinct advantage of the employer," Dulany Foods, Inc. v. Ayers, 220 Va. 502, 510 (1979), a

---

[5] Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party moving for summary judgment bears the burden of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In reviewing a summary judgment motion under Rule 56, the court "must draw all justifiable inferences in favor of the nonmoving party." United States v. Carolina Transformer Co., 978 F.2d 832, 835 (4th Cir. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

legally enforceable obligation to pay accrued benefits *may* arise when an employee "accepts" an employer's promise of those benefits by continuing to work for the employer, see id. at 509–10, 513. That is precisely the limited theory on which the court previously allowed Sewell's claim for accrued benefits to proceed.

Sewell has grounded her Dulany Foods-derived contract-for-benefits claim on the premise that she was entitled to accrued benefits unless she was discharged for cause, and that Wells Fargo devised a reason to terminate her for cause so that it could withhold those benefits.[6] Sewell has expended considerable resources in an effort to establish the speciousness of her termination (for instance, by collaterally attacking her own signed admission of wrongdoing). Despite months of discovery, however, Sewell has marshaled nothing showing that Wells Fargo withheld benefits she would have received had Wells Fargo terminated her *without* cause. Though Sewell has *mentioned* a variety of benefits to which she feels entitled, she has offered no evidence of an unfulfilled obligation that actually (or even plausibly) applies to her.[7] Because

---

[6] Sewell framed her argument as follows: "Defendant Wells Fargo falsely accused Adrienne Sewell of falsifying banking records and then fired her based on this fabrication. Defendant Wells Fargo then used the false allegation as a reason to deny Adrienne Sewell both benefits and monetary compensation that she had earned. Under Virginia law, upon termination an at-will employee can recover for breach of contract based on the denial of earned employee benefits. Defendant Wells Fargo's arguments that the employee handbook is not a contract are simply irrelevant. . . . Dulany Foods, Inc. v. Ayers, 220 Va. 502, 260 S.E.2d 196 (1979)." (Resp. Opp. Mot. Dismiss 4, ECF No. 28.) Based on that argument, the court's earlier memorandum opinion explained that "Sewell alleges facts plausibly showing that Wells Fargo promised Sewell various benefits . . . , that Sewell worked for Wells Fargo for approximately five years, that Wells Fargo intentionally classified her termination in such a way as to avoid paying benefits, and that she has been injured by that conduct. As alleged, those facts are sufficient to state a plausible claim for breach of contract." (See Mem. Op. 5, ECF No. 32.)

Although Sewell has admitted repeatedly that her employment with Wells Fargo was on an at-will basis, (see, e.g., Resp. Mot. Summ. J. 6, ECF No. 72), and she in fact signed a document acknowledging the nature of her employment, (Mot. Dismiss Ex. A, ECF No. 27-1), Sewell's argument has now veered from her Dulany Foods theory: "[P]laintiff obtained a declaration from the district manager who made the offer, Mr. Judson Bell, that does establish a valid offer and acceptance creating an employment contract regarding the position of service manager." (Reply. Supp. Mot. Summ. J. 3, ECF No. 79.) There remains, however, absolutely no evidence of a contract for employment subject to anything other than the basic at-will employment doctrine, and the court will not consider the argument further.

[7] Sewell recites (but never supports) a number of claims to benefits: "Defendant Wells Fargo neglects to include maternity benefits earned by plaintiff Adrienne Sewell . . . ." (Resp. Opp. Mot. Summ. J. 5, ECF No. 72.)

"Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

"Ms. Sewell is not suing *upon* the handbook as a contract but upon the promises made by Wells Fargo including relevant promises contained *in* the handbook." (Id. at 4.) "Defendant Wells Fargo also fails to include substantial earnings from Paid Time Off that it never paid plaintiff." (Id. at 6.) "Under the procedures that Wells Fargo agreed to abide by, termination without cause gave an employee a right to severance pay." (Id. at 18–19.) "Wells Fargo had a duty to provide Adrienne Sewell with all of the benefits that she earned including the right to be eligible for rehire." (Mot. Summ. J. 12, ECF No. 67.) "But for the false charges, Ms. Sewell would be classified as eligible for rehire." (Reply. Supp. Mot. Summ. J. 2, ECF No. 79.) "The terms included benefits such as payment for accrued and earned paid time off, insurance opportunities, maternity leave, eligibility for rehire, and severance pay." (Id. at 3.)

    Three of these merit further discussion. First, Sewell claims she was entitled to the "benefit" of being classified as "eligible for rehire." Notwithstanding the fact that Sewell has failed to indentify how Wells Fargo contractually bound itself to provide this "benefit" (it certainly did not do so in the employee handbook, which disclaims its status as a contract), the notion strains the definition of a "benefit." Second, Sewell refers to paid time off for which Wells Fargo allegedly owes her compensation. Sewell's counsel previously attempted to introduce the opinion of an expert witness regarding the value of the paid time off, but the court excluded it as clearly untimely under the Federal Rules of Civil Procedure. (See Order, ECF No. 62.) Not only, then, is that evidence not properly before the court, but Sewell herself has indicated that she had a negligible amount of paid time off when Wells Fargo terminated her, and that compensation for paid time off is not the basis of her lawsuit:

    Q    All right. Switching gears a little bit here, are you claiming as part of this lawsuit that you had a certain amount of accrued [paid time off] at the time you were let go, and you didn't get all that when you were terminated?

    A    There might be four hours, five hours left that I didn't receive. What I am claiming is that I was falsely terminated, and I had built my career to this level, and now I am not due that to move on up in my career.

(Reply Supp. Mot. Summ. J. Ex. B, 2, ECF No. 78-2.) Third, and finally, Sewell cites generally to the Benefits Book and refers to a severance-pay plan she claims might have had some theoretical application. According to the Benefits Book, the plan is available to an employee after "position elimination" or a "substantial position change." (Mot. Summ. J. Ex. A., 68, ECF No. 65-3.) Regardless of whether Sewell's termination theoretically could have qualified under the plan, the Benefits Book explains that the plan is a "'welfare benefit plan' as that term is described under [the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*]," that employees have a right to sue under § 502(a) of ERISA [29 U.S.C. § 1132] when the plan administrator denies a claim, and that employees should use the "Plan identification number . . . 512" when corresponding with the government about the plan. (Mot. Summ. J. Ex. A., 68, 75, 76, ECF No. 65-3.) Sewell does not contest the fact that the plan is governed by ERISA, and instead argues that "ERISA is . . . irrelevant because the issue is not the denial of benefits to a person covered by an employee benefit plan but the right of the employee, in this case Ms. Sewell, to coverage and opportunities provided by the employer." (Resp. Opp. Mot. Summ. J. 19, ECF No. 72.)

    ERISA preempts state laws that "relate to" employee welfare benefit plans, including the common law rights of employees seeking to recover plan benefits. 29 U.S.C. § 1144(a); Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45 (1987) ("If a state law 'relate[s] to . . . employee benefit plan[s],' it is pre-empted."); see also Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 62 (1987) (finding that ERISA preempted a common law contract claim for benefits); Gresham v. Lumbermen's Mut. Cas. Co., 404 F.3d 253, 258 (4th Cir. 2005) ("Generally, when a state law claim may fairly be viewed as an alternative means of recovering benefits allegedly due under ERISA, there will be preemption."); Darcangelo v. Verizon Commc'ns, Inc., 292 F.3d 181, 195 (4th Cir. 2002) ("[A]n action to enforce the terms of a contract, when that contract is an ERISA plan, is of necessity an alternative enforcement mechanism for ERISA § 502 and is therefore 'relate[d] to' an ERISA plan and preempted by § 514."). Sewell has marshaled no facts indicating that the plan (or, for that matter, *any* plan in the Benefits Book) is anything but a "welfare benefit plan" subject to ERISA and, consequently, ERISA preemption. Under ERISA, Sewell is obligated to exhaust her administrative remedies before prosecuting her claim in court. See Hickey v. Digital Equip. Corp., 43 F.3d 941, 945 (4th Cir. 1995).

which that party will bear the burden of proof at trial," the court grants Wells Fargo's motion for summary judgment on this claim. Celotex, 477 U.S. at 323.

### III.

Sewell contends that Wells Fargo employees discussed the circumstances of her termination with others and thereby defamed her. Because Sewell has not established the fault necessary to impose liability, the court grants Wells Fargo's motion for summary judgment.

Under Virginia law, a private individual suing for defamation must show that the defendant was at fault for publishing a false, defamatory statement. See Lewis v. Kei, 281 Va. 715, 725 (2011) (citing Hyland v. Raytheon Tech. Servs. Co., 277 Va. 40, 46 (2009)); Jordan v. Kollman, 269 Va. 569, 575 (2005). Defamatory statements are those that concern and harm the plaintiff or the plaintiff's reputation. Hyland, 277 Va. at 46; see also Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1108 (4th Cir. 1993) ("To be 'actionable,' the statement must be not only false, but also defamatory, that is, it must 'tend[ ] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" (quoting Restatement (Second) of Torts § 559)). Words that prejudice a person in his profession, or which impute an unfitness to perform the duties of employment, are defamatory per se. Carwile v. Richmond Newspapers, 196 Va. 1, 7 (1954); see also Hyland, 277 Va. at 46. To establish fault, a private individual "must show that the defendant knew that the statement was false, or, believing that the statement was true, lacked a reasonable basis for such belief, or acted negligently in failing to determine the facts on which the publication was based." Lewis, 281 Va. at 725; Food Lion, Inc. v. Melton, 250 Va. 144, 150 (1995).

Here, Sewell identifies the following instances of alleged defamation[8] by Wells Fargo's employees:

> "[Wells Fargo customer] Ms. Hurley recalled specifically that Stefanie Mittman, an employee at Wells Fargo during business hours physically closed a door so that others could not hear and told Ms. Hurley that everyone, including Adrienne Sewell, had been terminated for 'failure to follow policy and procedure.'" (Mot. Summ. J. 10, ECF No. 67.)
>
> "Jason Diggs, a former Wells Fargo employee, testified under oath that Virginia Hager, the store manager, told tellers at the branch that all the other tellers had been fired for 'falsifying documents.'" (Id.)
>
> "Virginia Hager . . . instructed tellers . . . if customers persisted in asking questions to say that Adrienne Sewell and other tellers were terminated for 'not following policy and procedure.'" (Id.)[9]

However, it is uncontradicted that before anything was said concerning Sewell's termination, Wells Fargo's chief investigative officer had already conducted an investigation, gathered supporting suspicious electronic bank records, and interviewed the tellers involved (including Sewell). Sewell and all but one of the other tellers admitted to electronically buying and selling cash without physically exchanging it, which is undisputedly a violation of Wells Fargo policy. (See Mot. Summ. J. Ex. A, 88, ECF No. 65-3.) ("Q: Do you acknowledge that your participation

---

[8] Sewell mentions various other statements, none of which are remotely actionable.

[9] These three assertions are not entirely accurate. For instance, Hurley did not say "failure to follow policy and procedure." Rather, Hurley made this statement: "[Mittman] said that they were let go for not following procedure, and that's exactly what she said to me." (Reply Supp. Mot. Summ. J. Ex. 4, 2, ECF No. 79-4.) "She didn't say policy, that she never followed policy. I never stated that, because she didn't say that to me." (Id. at 4.) Whatever the precise statement, each of Sewell's allegations involves some variation on the theme of falsification or non-adherence to procedure.
  Sewell's latest filings are replete with similar inaccuracies. For example, she states, "[According to page 1-4 of the Benefits Book, employees] that are laid off have the option to purchase insurance at preferential rates for up to 18 months after employment." (Resp. Opp. Mot. Summ. J. 6, ECF No. 72.) However, page 1-4 of the Benefits Book does not mention layoffs, post-layoff insurance rates, or any post-layoff purchasing window. (See Add'l Ev. Ex. 1, ECF No. 75-1.) Sewell also claims that, "In violation of its duties of disclosure, defendant Wells Fargo refused to even discuss the terms of plaintiff Adrienne Sewell's last employment contract for service manager." (Reply Supp. Mot. Summ. J. 2, ECF No. 79) (citing a deposition of a Wells Fargo witness). In fact, the witness made no such refusal and answered all of counsel's questions. (See Reply Supp. Mot. Summ. J. Ex. 11, 2, ECF No. 79-11.)

with processing buys and sells on the system without exchanging cash to maintain cash limits for other tellers is manipulating the teller settlement and a falsification? A: I now understand that but at the time did not. [/s/ Adrienne Sewell]"). Some of the tellers implicated Sewell in those transactions and even claimed to have learned the technique from her. (Mot. Summ. J. Ex. A, 86, ECF No. 65-3) (signed admission dated May 12, 2010, stating, "I acknowledge that I misstated my balance sheet so I would be under the cash limit. This activity started 3 years ago and was taught to us by Adrienne [Sewell]. We would buy and sell money without exchanging money. All of the tellers did this same procedure."). After the investigation, Williams discussed his findings with Wells Fargo's Senior Human Resources Advisor and the District Manager. All three of them agreed that Wells Fargo should terminate the employees for their participation in the transactions.

In the face of an investigation buttressed by transactional records and written admissions, Sewell has endeavored to shift theories and arguments but has failed to make a coherent, factual showing that Wells Fargo knew that its statements were false, or, believing them true, lacked a reasonable basis for that belief or acted negligently in failing to determine the facts on which the publications were based. Sewell has therefore failed to make a showing sufficient to establish the existence of an element essential to her case. Accordingly, the court grants Wells Fargo's motion for summary judgment on this claim.[10]

---

[10] In Virginia, the plaintiff bears the burden of proving that the alleged defamatory statement is false. See Chapin, 993 F.2d at 1108 ("[I]n Virginia . . . the plaintiff now carries the initial burden of proving falsity."); see also Am. Commc'ns Network, Inc. v. Williams, 264 Va. 336, 340–41 (2002) (explaining that true statements are not actionable). Here, not only has Sewell failed to establish fault, she has not proved falsity.

## IV.

For the reasons stated, the court grants Wells Fargo's motion for summary judgment and denies Sewell's motion for summary judgment.

**ENTER:** August 14, 2012.

_____
UNITED STATES DISTRICT JUDGE